## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | 3:09CR117 (MRK) |
| | : | |
| | : | |
| MARTIN McKREITH | : | |

### RULING AND ORDER

In this case, involving 33 individuals, Defendant Martin McKreith has been indicted on charges of conspiracy to possess with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), and 846; and possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), and 18 U.S.C. § 2. Mr. McKreith has now moved to suppress two kilograms of cocaine found in a car he was driving on April 8, 2009. *See* Mot. to Suppress [doc. # 702]. There are three issues raised by the motion: first, whether the police stop of the car that Mr. McKreith was driving was pretextual; second, whether the search of the interior of the car was based on probable cause; and third, whether a warrantless search was justified under the "automobile exception" even where the car was under the control of the police for all practical purposes. The Court held an evidentiary hearing on the suppression motion on February 18, 23, and 24, 2010. Four witnesses testified at the hearing. Based upon the briefs submitted by the parties and the evidence presented at the evidentiary hearing, the Court concludes that the stop of the car that Mr. McKreith was driving on April 8, 2009, was valid and not pretextual, that the search of the interior of the car was based upon probable cause, and that no search warrant was required. Therefore, the Court DENIES Mr. McKreith's Motion to Suppress [doc. # 702].

# I.

The facts giving rise to Mr. McKreith's suppression motion are largely undisputed.  In connection with an investigation of Peter Maylor, one of Mr. McKreith's co-defendants, officers associated with the Drug Enforcement Agency (DEA) obtained an order allowing law enforcement officers to wiretap Mr. Maylor's phone.  Mr. Maylor was believed to be a large distributor of drugs in the Hartford area.  In approximately December 2008, there were calls to Mr. Maylor's phone from a person who had subscribed to a phone that listed 35 Love Lane in Hartford as its address.  That is where Mr. McKreith lived.

On April 8, 2009, case agents investigating Mr. Maylor intercepted approximately ten phone calls between Mr. Maylor and Glenn Smith (another co-defendant, also indicted for conspiracy to distribute narcotics), during which the two apparently discussed driving down to New York to pick up drugs.  The calls also suggested that Mr. Maylor and Mr. Smith intended to find a third person to drive a second car back from New York.  Agents also intercepted a call between Mr. Maylor and the phone subscribed to Mr. McKreith, during which Mr. Maylor told Mr. McKreith that Mr. Maylor would pick up Mr. McKreith at his house.[1]  Surveillance of Mr. Maylor was established, and agents observed Messrs. Maylor and McKreith proceed to Mr. Smith's residence in Mr. Maylor's Nissan Titan.  The three of them then drove to the Bronx, where agents observed what they believed to be a drug transaction with co-defendant Luis Montas, a known supplier of Mr. Maylor.  At some point, Mr. McKreith left Messrs. Maylor and Smith, and the agents concluded that he was driving back to Hartford in a separate car that probably contained the drugs that were purchased from Mr. Montas.  In fact, agents intercepted a

---

[1] The Court notes that the law enforcement officers involved with the investigation were largely unfamiliar with Mr. McKreith at this time, and therefore did not confirm his identity until later that evening.  However, for ease of discussion, the Court refers to the then-unidentified third individual as "Mr. McKreith."

call between Messrs. Maylor and McKreith in which Mr. McKreith indicated that he had successfully picked up the separate car, and Mr. Maylor instructed him to drive back to Connecticut.  Certain agents followed Messrs. Maylor and Smith back to Connecticut, although they lost those two in or around Stratford.  Other agents returned to Hartford and Newington to see if they could locate Mr. McKreith.

Based on the timing of the activities in New York and the phone call between Messrs. Maylor and McKreith, it appears that Mr. McKreith left New York to return to Hartford at approximately 4:00 p.m.  Slightly before 7:00 p.m. that evening, two agents observed Mr. McKreith leaving 35 Love Lane in Hartford in a Mercury Villager minivan that was known to belong to Mr. Smith.  The agents lost sight of the Villager shortly thereafter.  Other agents searched the Northeast section of Hartford for the minivan, and eventually DEA Task Force Officer Bellizzi located the Villager on Garden Street in Hartford, not far from Love Lane.  The Villager was backing out onto Garden Street below Albany Avenue, and Officer Bellizzi was able to pull up directly behind it.  At or around the same time, Detective Pillai of the Hartford Police Department turned onto Garden Street and saw Officer Bellizzi's car and the Villager. The Villager proceeded north on Garden Street, but when the car got to Albany Avenue the light was red.  Nevertheless, according to both Officer Bellizzi and Detective Pillai, the Villager proceeded through the red light and across Albany Avenue, nearly hitting a car proceeding down Albany Avenue according to Detective Pillai.

Based on DEA radio transmissions among the team members, either Detective Laureano, also of the Hartford Police Department, or Detective Pillai called for a Hartford police officer to stop the Villager because of the traffic violation.[2]  Hartford Police Officer Morrison was in the

---

[2] It was not entirely clear, from the evidence presented at the hearing, which Detective made the call, but it is immaterial to the Court's decision.

vicinity at the time, and he pulled onto Garden Street and caught up to the Villager across Albany Avenue.  The Villager then took a left onto Mather Street, at which point Officer Morrison – who had been informed that the Villager had run a red light – activated his lights and pulled the Villager over.  Officer Morrison asked for Mr. McKreith's drivers license, registration and insurance card.  The car was registered to Mr. Smith not to Mr. McKreith.  In any event, when Officer Morrison provided information to the dispatcher regarding Mr. McKreith, he learned that there was an outstanding warrant for Mr. McKreith's arrest for parole violations. Officer Morrison then returned to the car in which Mr. McKreith was sitting and asked him to step out of the car so Officer Morrison could place him under arrest.

At or around the same time, Detective Pillai, Officer Billizzi, Detective Laureano, and Detective Plourde, a narcotics canine officer, arrived at the scene.  The canine officer arrived within five minutes of the stop.  The dog was escorted around the exterior of the vehicle, but it is unclear whether she alerted to the presence of narcotics on the driver's side of the van or simply showed some interest in that area.  In any event, the officers allowed the dog to enter the interior of the vehicle, and she alerted to an area behind the driver's seat.  Detectives Pillai and Billizzi then looked where the dog was alerting and found a hidden compartment.  Inside the compartment were two bricks of what was later determined to be cocaine – a total of two kilograms.

## II.

As an initial matter, the Court notes that during the pre-hearing briefing on this motion, the Government stated that the dog had alerted during the walk-around of the exterior of the minivan, and was only allowed to enter the vehicle after a positive alert.  Therefore, because an exterior walk-around by a canine is not a search for Fourth Amendment purposes, and because

an alert during an exterior walk-around provides probable cause for a search, the Government argued that the search of the Villager was lawful. *See Illinois v. Caballes*, 543 U.S. 405, 410 (2005) (exterior walk-around does not implicate Fourth Amendment); *United States v. Collins*, 206 Fed. Appx. 23, 24 (2d Cir. 2006) (summary order) (canine's positive alert on the exterior of a vehicle provides probable cause to search the vehicle).

However, during the hearing it became less clear whether the dog actually alerted before entering the minivan. Detective Plourde could not remember whether the dog alerted to the exterior of the van, and he also testified that he was not so concerned with the exterior walk-around because he intended have the dog enter the Villager whether she alerted or not. According to Detective Plourde, he believed such action was justified as part of a search incident to Mr. McKreith's arrest. Detective Plourde also testified that the other officers – who testified that the dog alerted on the exterior of the Villager – were not sufficiently trained or acquainted with his canine to be able to tell an alert from mere interest.

Based on Detective Plourde's testimony, the Government has wisely decided not to rely on the dog's alleged alert to the exterior of the car. Instead, the Government claims that they had probable cause, based on the totality of the circumstances, to search the car once it was stopped for a traffic violation, and that they did not need a warrant to do so. Mr. McKreith argues that the stop was pretextual; that no probable cause existed for the search; and that even if probable cause did exist, the officers were required to obtain a warrant before conducting the search. The Court addresses each of these issues in turn.

<u>Automobile Stop</u>

Both sides agree that where officers have probable cause to believe that a traffic violation has occurred, police may stop a vehicle. As the Supreme Court held in *Whren v. United States*,

5

517 U.S. 806 (1996), "as a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810; *see also, e.g.*, *United States v. Dhinsa*, 171 F.3d 721, 724 (2d Cir. 1999) ("[A] police officer who observes a traffic violation may stop a car without regard to what a 'reasonable officer' would do under the circumstances and without regard to the officer's own subjective intent."); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) ("[W]hen an officer observes a traffic offense – however minor – he has probable cause to stop the driver of that vehicle.").  Probable cause arises when a police officer reasonably believes that an offense has been committed or is being committed.  *See Scopo*, 19 F.3d at 781.

Where the parties part company is on whether, in this case, police did in fact see Mr. McKreith commit a traffic violation.  Mr. McKreith questions the credibility of the police officers for two reasons.  First, he argues that police had decided to pull the vehicle over even before Mr. McKreith committed an alleged traffic violation because they suspected that proceeds from a drug transaction were located in the car.  Second, Mr. McKreith asserts that at least four individuals in this case were pulled over during traffic stops in connection with the investigation of Peter Maylor, which suggests that the police activity in this case was pretextual and not real. The Court rejects each argument.

As an initial matter, the subjective intentions of the police are not relevant.  *See Arkansas v. Sullivan,* 532 U.S. 769, 771-772 (2001) (reversing state court's determination that a traffic stop supported probable cause was nonetheless improper because of the officer's subjective motivations).  As the Supreme Court noted in *Whren*, the officer's "[s]ubjective intentions" in stopping the vehicle "play no role in ordinary, probable-cause Fourth Amendment analysis," so long as the stop is supported by objective probable cause for a traffic violation.  517 U.S. at 813-

14; *see also Dhinsa*, 171 F.3d at 724-25 ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance.").

What *is* relevant is what objectively occurred, and the Court has no difficulty concluding that the officers testified truthfully and that they observed Mr. McKreith run through a red light on Albany Avenue. That information was then conveyed to Officer Morrison, who was entitled to pull the vehicle over on the basis of the traffic violations observed by Officer Belizzi and Detective Pillai.[3] *See, e.g.*, *United States v. Harrell*, 268 F.3d 141 (2d Cir. 2001) (affirming denial of motion to suppress drugs and weapons found during traffic stop where stop was based on violation of New York traffic law prohibiting tinted windows); *United States v. Hiruko*, 320 F. Supp. 2d 26 (E.D.N.Y. 2004) (speeding and seatbelt violations permitted traffic stop that eventually led to seizure of counterfeit money); *United States v. Graham*, 119 F. Supp. 2d 116 (D. Conn. 2000) (speeding violation justified traffic stop as a result of which officers discovered controlled substance in plain view).

Furthermore, the fact that officers pulled over other defendants for traffic violations in this 33-defendant investigation does not mean that Detective Pillai and Officer Belizzi were lying in this case. The Court found their testimony to be credible, and it was confirmed by the police report filed after Mr. McKreith's arrest. The report mentions that Mr. McKreith ran a red

---

[3] "Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (citing *United States v. Hensley*, 469 U.S. 221, 230-33 (1985)). "The rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986); *see also Hensley*, 469 U.S. at 230-33.

light on Albany Avenue, and he was issued a citation for such violation.  Also, according to Officer Morrison, when he told Mr. McKreith why he had been pulled over, Mr. McKreith did not object or deny that he had run a red light.  As Officer Belizi and Detective Pillai testified, while they were looking for a traffic violation, they also understood they could not stop the Villager without observing one.  There is nothing unlawful about police looking for a traffic violation so long as the stop is not pretextual.  It was not in this case.[4]

Probable Cause

Because the traffic stop was lawful, the question becomes whether the officers had probable cause to search the car.  "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The focus of a probable cause inquiry is on "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

> Thus, probable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched. . . .  The standard does not demand certainty but only a fair probability that contraband or evidence of a crime will be found. . . .  Further, courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not.

*Id*. at 456-57.

In this case, the officers were quite familiar with Messrs. Maylor and Smith based on months of surveillance.  The officers intercepted calls that morning that clearly indicated that Messrs. Maylor and Smith intended to drive down to New York to participate in a narcotics

---

[4] In addition, if probable cause existed prior to the traffic stop – which it almost certainly did – the officers would have been justified in pulling the car over even absent a traffic violation. However, because the Court finds that the traffic stop was not pretextual, and because neither party addressed this question, the Court need not decide this issue.

transaction, and that they intended to use a third person to drive a car containing the fruits of that transaction back from New York to Hartford.  They then saw Mr. McKreith join Messrs. Maylor and Smith for the trip to New York and also observed three individuals in the Nissan Titan driving to New York.  It was logical for police to determine that the three intended to participate in a likely drug deal, after which Mr. McKreith would drive a car back to Hartford with the results of the drug transaction.[5]   Based on another intercepted call, police properly concluded that Mr. McKreith was in a separate car driving back to Hartford.  Although officers never actually observed Mr. McKreith driving back from New York in a Villager, he was spotted in the Hartford area driving the Villager, which the officers knew to be Mr. Smith's car, not Mr. McKreith's, at approximately the time that he would have been expected to arrive in Hartford from New York.  *See United States v. Howard*, 489 F.3d 484, 491 (2d Cir. 2007) (finding probable cause where defendant was not seen arriving in or leaving New York, but intercepted phone calls established that he was in New York to engage in a narcotics transaction, and he was stopped in Schenectady at about the time when he would have been expected to be returning from New York based on the estimated travel time).

Based on this account, which went basically undisputed at the evidentiary hearing, law enforcement officers had ample reason to believe that the Villager contained narcotics. Therefore, on the basis of the totality of circumstances, the Court has little trouble concluding that the police had probable cause to conduct a search of the Villager and, in particular, to place the drug-sniffing canine into the Villager.

---

[5] During their investigation of Mr. Maylor, police had stopped the vehicles of other individuals thought to have engaged in drug transactions and found substantial amounts of money secreted in hidden compartments of those vehicles.  *See* Post-Hearing Mem. in Opp'n to Def.'s Mot. to Suppress [doc. # 795] at 3.

<u>Warrantless Search</u>

However, the inquiry does not end with probable cause.  Ordinarily, even where law enforcement officers have probable cause, they must obtain a warrant prior to conducting a search.  *See Howard*, 489 F.3d at 492.  However, there are some limited exceptions to this requirement, one of which – the automobile exception – is relevant to this case.  *See id.*  "Under the automobile exception, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime."  *Id.* (internal quotation marks and citations omitted).

> The Supreme Court has justified the automobile exception under two distinct theories: First, the Court has noted that a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home, . . . and, second, the Court has held that because a vehicle is readily movable, exigent circumstances might require a warrantless search . . . .

*Id.* (internal citations omitted).

The Government does not deny that they could have obtained a warrant in this case.  Mr. McKreith was placed under arrest and taken into custody, and the Villager was impounded.  There were no exigent circumstances requiring an immediate search of the vehicle – it was firmly under the officers' control and would likely stay that way.  Nevertheless, the Government contends that the automobile exception applies even in cases where it would be practical to obtain a search warrant.  By contrast, Mr. McKreith argues that the automobile exception applies only where there is some risk that the car will actually be moved.  Based on controlling precedent, the Court agrees with the Government.

In *Howard*, as in this case, law enforcement officers were investigating a narcotics conspiracy.  On two occasions, officers intercepted calls suggesting that a drug transaction was going to take place, established surveillance, and observed such a transaction.  *See id.* at 487-90.

In both cases police then pulled over a vehicle whose occupants had been involved in the transaction and used a ruse to lure the defendants away from their car, at which point they searched the car without a warrant and found narcotics and money.  *See id.*  The district court suppressed the fruits of these searches, reasoning that the automobile exception is based on the risk that the vehicle will be moved, and that no such risk existed in this case because the officers were able to lure the defendants away from their vehicles for enough time to obtain a warrant and conduct a search.  *See id.* at 490.

The Second Circuit rejected the district court's understanding of the automobile exception.

> Whether a vehicle is "readily mobile" within the meaning of the automobile exception has more to do with the inherent mobility of the vehicle than with the potential for the vehicle to be moved from the jurisdiction, thereby precluding a search. . . . The district court's reading of "ready mobility" is in error because the district court appeared to regard the actual ability of a driver or passenger to flee immediately in the car, or the likelihood of him or her doing so, as a requirement for the application of the automobile exception.

*Id.* at 493 (internal citation omitted).  In other words, the logic of the automobile exception applies even where there is little risk that the vehicle will actually be moved.  The exception is based on the "inherent mobility" of automobiles, and does not require exigent circumstances to be applicable.  *See id.* at 494.  "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *see also Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam).

In reversing the district court in *Howard*, the Second Circuit also relied on the other justification for the automobile exception – the fact that the occupants of a car have a diminished expectation of privacy.  *See* 489 F.3d at 494.  "Thus even if the vehicles searched in the case at

bar were not 'readily mobile' within the meaning of the automobile exception, a warrantless search of them would be justified based on the diminished expectation of privacy enjoyed by the drivers and passenger while traveling on the Thruway."  *Id.*

Mr. McKreith attempts to distinguish *Howard* based on the fact that defendants in that case were not placed under arrest, and therefore there was some possibility that they or someone else could have moved the car.  *See* Def.'s Supp. Mem. of Law in Support of Mot. to Suppress [doc. # 802] at 5-6.  Mr. McKreith argues that because he was arrested, there was no possibility that the Villager would be moved.  *See id.* at 6.  However, he cites no cases in support of his claim that the automobile exception does not apply where a defendant is placed under arrest. Furthermore, Mr. McKreith's argument does not square with Second Circuit and Supreme Court precedent, which – as discussed above – looks to the *inherent* mobility of the vehicle rather than the likelihood that it will actually be moved, as well as the reduced expectation of privacy in a car.  As the Second Circuit stated in *Howard*:

> Even where there is little practical likelihood that the vehicle will be driven away, the exception applies at least when that possibility exists. In this case, the police could not lawfully have detained the defendants in the police station had they not consented to remain there.  Furthermore, the possibility existed that confederates in another car, of whom the police were unaware, might have observed the police intervention and might drive the car away.

489 F.3d at 493-94.

In fact, on the day that this ruling was issued, the Second Circuit reaffirmed the principles underlying *Howard* in a way that is contrary to Mr. McKreith's argument.  *See United States v. Navas*, No. 09-1144-cr (2d Cir. Mar. 8, 2010).  In *Navas*, the court held that the automobile exception applied to a trailer unhitched from its cab, even when defendants were already placed under arrest.  *See id.*  The Second Circuit reiterated that "a vehicle's inherent mobility – not the probability that it might actually be set in motion – is the foundation of the mobility rationale."

*Id.*, slip op. at 15 (citing *Howard*, 489 F.3d at 493).  Thus, "the mobility rationale . . . does not turn on case-by-case determinations by agents in the field regarding either the probability that a vehicle could be mobilized or the speed with which movement could be achieved."  *Id.*, slip op. at 16.  The Second Circuit also emphasized that the location of the defendants at the time of the search – and thus whether the defendants are already under arrest – is not relevant to the automobile exception analysis.  *See id.*, slip op. at 19-20.

There may be cases where it would be so unlikely that a vehicle would or could be moved that the automobile exception would no longer apply, but this is not such a case.  At the very least, there was some possibility that the actual owner of the Villager, Mr. Smith, could have attempted to remove it from police custody.  The Court acknowledges that this scenario is unlikely, but the automobile exception does not turn on the "practical likelihood" that the vehicle will be moved.  *Howard*, 489 F.3d at 493-94.  As the Supreme Court observed in *Michigan v. Thomas*, 458 U.S. 259 (1982):

> [T]he justification to conduct a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been drive away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

*Id.* at 261.[6]

Therefore, the police did not violate Mr. McKreith's Fourth Amendment rights in placing the drug-sniffing dog into the interior of the Villager.  And, of course, once the dog alerted on the panel in the Villager, police were justified in searching the panel for drugs.  *See Caballes*, 543 U.S. at 410; *Collins*, 206 Fed. Appx. at 24.

---

[6] The Government correctly points out that the Supreme Court has upheld warrantless searches of automobiles even in cases where the vehicle was already in police custody.  *See Chambers v. Maroney*, 399 U.S. 42, 52 (1970); *Florida v. Meyers*, 466 U.S. 380, 382 (1984); *United States v. Johns*, 469 U.S. 478, 484 (1985).

**III.**

In sum, the Court concludes that the traffic stop was not pretextual; that the officers had probable cause to search the Villager; and that they were not required to obtain a warrant before conducting the search.  Therefore, Mr. McKreith's Motion to Suppress [doc. # 702] is DENIED.


IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge

Dated at New Haven, Connecticut: **March 8, 2010.**